IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,448

In the Matter of ALLISON L. BERGMAN,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed October 28, 2016. Indefinite suspension.

*Kate F. Baird*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*James L. Eisenbrandt*, of Berkowitz Oliver Williams Shaw & Eisenbrandt LLP, of Kansas City, Missouri, argued the cause, and *Allison L. Bergman*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Allison L. Bergman, of Kansas City, Missouri, an attorney admitted to the practice of law in Kansas in 1998.

On December 4, 2015, the office of the Disciplinary Administrator filed a formal complaint against the respondent, alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on December 23, 2015. A joint stipulation was entered into on January 22, 2016, in which respondent stipulated to the violations charged in the formal complaint. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on January 22, 2016, where the respondent was present and was represented by counsel. The hearing panel determined that respondent violated KRPC 1.7(a)(2) (2015 Kan. Ct. R. Annot. 519) (conflict of interest); 1.8(k) (2015 Kan. Ct. R. Annot. 530) (sexual relationship with client); 1.13(b)

1

and (d) (2015 Kan. Ct. R. Annot. 550) (organization as client); and 8.4(c) (2015 Kan. Ct. R. Annot. 672) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"7.     On May 26, 2015, the Missouri Supreme Court found that the respondent violated Rule 4-1.7, 4-1.8(j), 4-1.13(b), 4-1.13(d), and 4-8.4(c) of the Missouri Rules of Professional Conduct. [Footnote:  Missouri Rule of Professional Conduct 4-1.8(j) corresponds to KRPC 1.8(k). The other Missouri rules related directly to the Kansas rules with the corresponding numbers.] The Missouri Supreme Court issued an order suspending the respondent's license to practice law in Missouri indefinitely, but stayed the imposition of the suspension and placed the respondent on probation for a period of 2 years. The respondent remains on probation in Missouri.

"8.     A hearing panel in Missouri entered a final hearing report which set forth the factual basis for the discipline imposed in Missouri, as follows:

'7.     Kansas City Terminal Railway Co. ("KCT") is a Missouri corporation formed in 1906.

'8.     KCT is a joint entity owned by five Class One railroads that come into Kansas City:  the Union Pacific, BNSF, Kansas City Southern, Norfolk Southern and Canadian Pacific Railways. KCT's main function is to dispatch those roads/trains through Kansas City, as well as to maintain the approximately 100 miles of railroad that KCT owns and to serve 30 local customers in Kansas City.

2

'9.     Pursuant to KCT's bylaws, the corporation's property, business and affairs are controlled and managed by the KCT board of directors. KCT's bylaws specify that the corporation's president shall have the general care, supervision, and control of the corporation's business and operation in all departments subject to the direction of the board of directors.

'10.     KCT has annual revenues of $35,000,000-$40,000,000.

'11.     Since its formation in 1906, KCT had continuously utilized Lathrop & Gage LLP ("Lathrop") as its general counsel law firm.

'12.     Beginning in 1998, Respondent was employed as an attorney at Lathrop.

'13.     Respondent began performing legal work for KCT in 1999.

'14.     Respondent became a partner at Lathrop in 2005 and served on Lathrop's Executive Committee from July 1, 2007 to February 1, 2012.

'15.     Lathrop attorney Scott Long served as general counsel and corporate secretary for KCT from approximately 2002 to 2007.

'16.     By March 2003, Respondent became outside assistant general counsel and assistant secretary for KCT.

'17.     In 2007, Respondent was appointed to serve as outside general counsel for KCT. Respondent likewise was appointed to hold the office of corporate secretary for KCT. Respondent was secretary and general counsel for KCT from June 2007 to February 2012.

18.     Charles Mader ("Mader") is a professional engineer who specialized in railway design engineering. Until early 2007, Mader performed work for KCT through his employer, TranSystems Corp. In 2007, Mader was terminated from TranSystems Corp.

19.     William Somervell ("Somervell") was president of KCT and a member of its board of directors when Mader was hired. Somervell retired from KCT in 2009.

20.     Mader formed Interlocker LLC ("Interlocker") at the direction of Somervell in 2007 to provide civil engineering services solely to KCT.

21.     Respondent admits that in 2007, when Mader was terminated by TranSystems, KCT's president, Somervell stated to Respondent and Bradley E. Peek ("Peek"), then the chief financial officer of KCT, that Somervell was furious with TranSystems for firing Mader, and Somervell wanted Mader to continue to provide chief engineering services to KCT. Respondent admits that Somervell advised the KCT board of directors that Mader had been fired from TranSystems and that Mader was going to continue to providing [*sic*] engineering services to KCT through Mader's entity, Interlocker.

22.     Respondent admits that she was directed by KCT's board of directors to prepare a continuous services agreement for Mader's engagement. Respondent delegated the drafting of Mader's employment agreement to another Lathrop attorney, but admitted that she reviewed the employment agreement to confirm that salient points were contained therein and Respondent presented the Mader employment agreement to the board of directors.

4

'23.    In October 2007, Mader was hired as an actual full-time employee by KCT, initially as general manager and vice-president of engineering. He became president and chairman of the board of KCT in 2009 (after Somervell retired) and Mader continued in that capacity until he was terminated by the board of directors in 2012.

'24.    From 2002 until January 2012, Respondent and Mader were in a personal, close relationship. At times the relationship was romantic and sexual. At all times from 2002 to January 2012, the relationship between Mader and Respondent was a very close, deep, meaningful, sustained, loving, caring, intimate and special friendship with frequent social and personal interactions with each other.

'25.    The sexual relations between Respondent and Mader did not exist prior to the 1999 beginning of the attorney-client relationship between Respondent and her client, KCT.

'26.    Respondent admits that she did not at any time inform the KCT board of directors of her ongoing personal relationship with Mader. She admits she did not inform the board of directors at any time prior to or during:  her preparation of Mader's employment contract with KCT; Mader's initial employment providing engineering services for KCT; Mader becoming and serving as general manager and vice-president of KCT; or Mader's appointment to as [*sic*] serving as president and chairman of the board of directors of KCT.

'27    Brad Peek, current general manager and former president of KCT testified that Respondent did not but should have disclosed her personal, close, sexual relationship with Mader to KCT and its board of directors:  when Mader was hired in 2007; when he became and served as general manager; and when he was appointed to and served as president and chairman of the board of KCT.

5

'28.    Peek testified that had he known that Respondent and Mader were involved in an intimate, close, personal, and sexual relationship from the moment Mader was hired in September 2007 until his termination by the board of directors [in] 2012, Peek would have reported that situation to the board of directors.

'29.    Douglas Banks, long-time and current KCT board of director [*sic*], testified similarly. He was not aware of Respondent's relationship with Mader until 2012 (when allegations of impropriety surfaced regarding Mader) and had the board known earlier, the board would have had no choice but to [e]nd Respondent's role as general counsel and secretary.

'30.    Banks considered the relationship between Respondent and Mader to be a conflict of interest that resulted in a loss of trust and reliability by KCT as to Respondent as its general counsel and secretary, because Respondent did not disclose the relationship.

'31.    Banks testified that Respondent put the legal interests of KCT at risk by failing to disclose her relationship with Mader and he believed that beginning in September 2007, when Mader began employment with KCT, there was a significant risk that Respondent's representation of KCT would be materially limited by her personal interest in maintaining her relationship with Mader.

'32.    Both Peek and Banks testified that when allegations of misconduct arose regarding Mader in 2012, the personal relationship with Respondent and Mader was first discovered, and KCT was harmed in not being able to rely on and trust Respondent as general counsel to guide KCT on matters involving Mader and his alleged misconduct and on issues relating to and involving Mader's employment agreement with KCT.

'33.    Banks testified that upon learning of the personal relationship between Respondent and Mader, and upon learning of the ownership interest and Respondent's billing of legal fees for the Tallgrass Railcar, *infra*, the Board felt that the conflict of interest and resultant loss of trust and reliability left no choice for KCT other than to terminate Respondent as general counsel and secretary and to terminate KCT's long-standing relationship with Lathrop.

'34.    Banks testified that the board members, upon learning of the personal relationship between Respondent and Mader, and upon learning of the ownership interest and Respondent's billing of legal fees for the Tallgrass Railcar, *infra*, it was the collective opinion of the board that it had no choice but to terminate Mader and Respondent. He explained that part of the board's disappointment was because the role that Respondent played as general counsel was one of extreme trust and reliance and an independent source of guidance and information. The board felt this was compromised and there was no choice but to terminate Respondent as general counsel and secretary and to terminate KCT's long-standing relationship with Lathrop.

'35.    Both Peek and Banks testified that Mader had extensive dealings with Respondent in her capacity as KCT's general counsel when he became general manager in 2007, and Mader directly supervised and oversaw Respondent's legal work on a daily if not weekly basis when Mader became president of KCT in 2009 and until his termination in 2012.

'36.    Between 2007 through 2011, KCT was Respondent's most important client, to whom Respondent devoted the majority of her professional services.

7

'37.    From 2007 through 2011, Respondent was the supervising attorney with respect to all legal matters handled by Lathrop on behalf of KCT.

'38.    Respondent was responsible for all billings submitted by Lathrop to KCT.

'39.    When Mader became KCT president, he had the authority and approved Lathrop's legal bills submitted by Respondent.

'40.    Respondent was consulted by KCT management on a weekly (if not daily) basis on many legal aspects of KCT's operations, and attended all KCT board of directors meetings. Respondent routinely negotiated, drafted and reviewed contracts on behalf of KCT.

'41.    Respondent presented recommendations of the executive committee and compensation recommendations prepared by the president at the fourth quarter, year-end meetings. At a special meeting of the executive committee, on September 13, 2007, Respondent presented a summary of the material terms of Mader's employment contract, and salary and title modification for Peek, to the full board of directors.

'42.    Respondent was the sole drafter of the KCT corporate ethics policy, with the assistance of a Lathrop attorney as to the employment and benefit sections.

'43.    The ethics policy addresses nepotism involving family members. The policy prohibits KCT employees from supervising a family member. The policy sets forth an expansive definition of a "family member" to include an employee's "significant other."

'44.     The ethics policy also imposed restrictions upon the outside business interests and activities of KCT employees.

'45.     For the years 2004 through 2007, Lathrop annual billings to KCT averaged $290,834.

'46.     For the years 2008 through 2011, while Respondent was general counsel and in charge of Lathrop's billings to KCT, annual billings averaged $522,279.

'47.     For the years 2009 through 2011, while Mader was directing Respondent's work and approving Lathrop's billings the annual average was $572,718.

'48.     Lathrop's billings for 2012, the last full year that Respondent served as general counsel and Mader as president were not presented in evidence.

'49.     During 2007, Somervall [*sic*] began to consider the purchase of a private railcar, for use by KCT.

'50.     Respondent, at the request of Somervell, assigned a Lathrop attorney to prepare a comparative analysis of the relative benefits of owning or leasing a private car for KCT's occasional use.

'51.     The comparison favored purchase over leasing, and Somervell located a railcar, and took Respondent and Mader to see it.

'52.     During 2007 Somervell and Mader were engaged in negotiations for the purchase of the private rail car [*sic*] by KCT and Respondent and Lathrop attorneys to whom she delegated some of the work, performed substantial legal services relating to the contract negotiations and purchase agreement.

9

'53.    The negotiations for the purchase of the railcar were underway in the summer of 2007. An early draft of the proposed agreement, provided for a purchase price of $190,000, payable $120,000 in cash and $70,000 represented by KCT's promissory note dated August 2007.

'54.    A draft prepared in late August 2007, provided for a closing date of October 1, 2008 and a purchase price of $180,000, with a $60,000 promissory note of KCT with interest at 6.5%, all due October 1, 2008.

'55.    Exhibit 59 appears to be a later draft as Exhibit 60, as the seller has been changed from Michael Fox to Century Rail Enterprises, and the sale price has changed back to the original $190,000 figure with $120,000 cash and $70,000 KCT promissory note.

'56.    At the direction of Somervell, Respondent formed Tallgrass on December 12, 2007. Lathrop billings for those services described it as the "acquisition entity".

'57.    Respondent knew, prior to the closing of the railcar purchase that Somervell and Mader were using the entity to make a personal purchase of the railcar, rather than on behalf of KCT.

'58.    Exhibit 15, the final agreement on the railcar purchase was executed on December 21, 2007, the same day as the sale closed. The final agreement had the purchaser's name changed from KCT to Tallgrass Railcars LLC and provided for a sale price of $185,000 all cash on closing.

'59.    Of particular note is the fact that Exhibit 15 provided that notices to Tallgrass were to be mailed to Tallgrass, at a post office box maintained by Mader for his outside enterprises, and made no mention of KCT.

'60.     Information related to the closing of the purchase reflected that the purchase price was paid by a check from Watco Companies Inc. ("Watco") in the sum of $166,500.00 and a check from Interlocker LLC, (Mader's engineering consulting company) for $18,500.00.

'61.     Watco is a vendor to KCT, and KCT is a significant customer of Watco.

'62.     Based on information which Mader or Somerville [*sic*] later provided to Lathrop's attorneys, Watco's 90% share of the consideration paid, resulted in capital equity of 50% of the member equity, and Mader's 10% share of the consideration resulted in a 50% member equity, which was allocated 25% to Mader, and 25% to Somervell, the then president of KCT. Apparently at the instruction of either Mader or Somervell, the Lathrop attorneys showed a capital contribution for each Mader and Somervell of $9,250 "plus services".

'63.     Neither Mader nor Somervell testified at the hearing, and the rationale for their professed ownership shares in Tallgrass was not explained in the evidence.

'64.     Respondent knew that after the purchase of the railcar by Mader and Somervell's entity (Tallgrass), KCT funds were spent over the next several months [in] refurbishing and renovating the railcar.

'65.     During the months following the railcar purchase, Respondent and Lathrop billed KCT and received payment for services for preparation of the Tallgrass operating agreement, and extensive services in the drafting of the lease proposed by Mader and Somervell, for Tallgrass to lease the railcar to KCT.

'66.    Respondent did not advise the KCT board of directors at any time of Mader's violations of the ethics policy, nepotism policy, and breaches of fiduciary duty. Likewise, Respondent did not report Somervell's breach of fiduciary duty to the KCT board of directors at any time.

'67.    Respondent admitted that she knew in October 2011 of the actual ownership interest in the railcar but she did not advise or report to the KCT board of directors Mader's and Somervell's actions and breaches, or report to KCT or its board or correct her billing to KCT for legal fees for services for preparation of the Tallgrass operating agreement, and extensive services in the drafting of a lease proposed by Mader and Somervell, for Tallgrass to lease the railcar to KCT.

'68.    In early 2012, a member of the KCT board of directors had an independent investigation conducted into the activities of the officers, Somervell, Mader and Respondent.

'69.    After the initial investigation and upon learning of the personal relationship between Respondent and Mader, the ownership interest and billing of the legal fees for the Tallgrass Railcar, the conflict of interest of Respondent, as a result of that, the loss of trust and reliability because the board had not been informed of the relationship and the billing of legal fees for Tallgrass Railcar, which were not related to KCT, the board took action to:

      a.    Remove Mader from the board of directors, and;

      b.    Terminate Mader as president of KCT, and;

      c.    Terminate Respondent as secretary of the corporation, and;

d.      Terminate Respondent as general counsel, and;

e.      End the relationship with Lathrop, as attorneys for KCT.

'70.    Throughout these proceedings, Respondent has persistently and adamantly denied *any* wrongdoing.

'71.    Respondent never informed the KCT board of directors of the nature of her relationship with Mader.

'72.    Respondent never advised the KCT board of directors of the risk which that relationship constituted to her independent representation of KCT, and in fact Respondent denied that the relationship entailed such a risk.

'73.    Respondent admitted Mader was not the client; instead, KCT was the client and under its bylaws, the board of directors was the highest operating authority of the corporation.

'74.    Respondent admitted that as KCT's general counsel and secretary, she owed a fiduciary obligation to the corporation and to its board of directors.

'75.    Respondent denied that she had an obligation to inform the board of directors of her relationship with Mader *at any point* after Mader became employed by KCT, or was appointed to or served as general manager and vice-president, or was appointed to and served as president of KCT and chairman of the board of directors.

13

'76.	Respondent did not present the testimony of any witness other than herself. She did not present any witness or exhibit proving that KCT or its board of directors knew of or consented to her serving as general counsel and secretary of KCT in light of her relationship with Mader when Mader became employed by KCT; or was appointed to general manager and vice-president; or was appointed to and served as president of KCT and chairman of the board.

'77.	The panel finds that based on the complete record, including the testimony of Pe[e]k and Banks, neither KCT nor its board of directors knew of or consented to her serving as general counsel and secretary of KCT in light of her relationship with Mader when Mader became employed by KCT; or was appointed to general manager and vice-president; or was appointed to and served as president of KCT and chairman of the board.

'78.	Respondent's testimony comprised approximately 1 1/2 hours of the first day of hearing and the entire second day. To the extent that her testimony conflicts with or is inconsistent with the findings of the panel set forth above, the panel has determined that Respondent's testimony was *not* credible.'

"9.	On January 22, 2016, the respondent, her counsel, and the disciplinary administrator'[s] office entered into a joint stipulation. In the stipulation, the respondent admitted that under Kan. Sup. Ct. R. 202, the Missouri Supreme Court order established conclusively that she violated KRPC 1.7, KRPC 1.8(k), KRPC 1.13(b), KRPC 1.13(d), and KRPC 8.4(c).

"*Conclusions of Law*

"10.	Under Kan. Sup. Ct. R. 202 and based upon the joint stipulation, the findings of fact, and the exhibits admitted into evidence, the hearing panel concludes as a

matter of law that the respondent violated KRPC 1.7, KRPC 1.8(k), KRPC 1.13(b), KRPC 1.13(d), and KRPC 8.4(c), as detailed below.

## "KRPC 1.7

"11.    KRPC 1.7 provides:

'(a)    Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

. . . .

(2)    there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.'

The respondent represented KCT when there was a substantial risk that her representation would be materially limited by the respondent's personal interest in and relationship with Mr. Mader, without complying with KRPC 1.7(b). Accordingly, the hearing panel concludes that the respondent violated KRPC 1.7(a)(2).

## "KRPC 1.8

"12.    'A lawyer shall not have sexual relations with a client unless a consensual sexual relationship existed between them when the client-lawyer relationship commenced.' KRPC 1.8(k). The respondent's client-lawyer relationship commenced in 1999. In 2002, the respondent developed a close, personal, and sexual relationship with Mr. Mader. Because Mr. Mader was a constituent of the respondent's client who supervised, directed, or regularly consulted with the respondent and because the respondent's sexual relationship began after the client-lawyer relationship commenced, the hearing panel concludes that the respondent violated KRPC 1.8(k).

"13.    KRPC 1.13 addresses special issues when a lawyer has an organization for a client. In this case, subsections (b) and (d) apply:

'(b)    If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization. Such measures may include among others:

(1)    asking for reconsideration of the matter;

(2)    advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and

(3)    referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest

authority that can act in behalf of the

organization as determined by applicable law.

. . . .

'(d)     In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.'

Under subsection (b), the respondent failed to address or report substantial injury to KCT caused by Mr. Somervell and Mr. Mader—the diversion and appropriation of the railcar purchase which had been negotiated for KCT, the attempt to lease the railcar owned by Tallgrass Railcars to KCT, and the appropriation of KCT assets for the renovation and improvement of the railcar owned by Tallgrass Railcars. Under subsection (d), the respondent failed to explain to the board of directors that KCT's interests were adverse to its constituents, Mr. Somervell and Mr. Mader. As such, the hearing panel concludes that the respondent violated KRPC 1.13(b) and KRPC 1.13(d).

"KRPC 8.4(c)

"14.     'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent engaged in conduct that involved dishonesty when she billed KCT for performing services for Tallgrass Railcars, LLC. Thus, the hearing panel concludes that the respondent violated KRPC 8.4(c).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"15.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for

17

Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"16.     *Duty Violated*.  The respondent violated her duty to her client to avoid conflicts of interest. The respondent also violated her duty to the public to maintain her personal integrity.

"17.     *Mental State*.  The respondent knowingly violated her duties.

"18.     *Injury*.  As a result of the respondent's misconduct, the respondent caused actual harm to KCT, her former law firm, and the legal profession.

"Aggravating and Mitigating Factors

"19.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"20.     *Dishonest or Selfish Motive*.  The respondent's misconduct was motivated by dishonesty. The respondent kept material information from her client for a period of years. The respondent concealed wrongdoing from KCT by two constituents. Accordingly, the hearing panel concludes that the respondent's misconduct was motivated by dishonesty.

"21.     *A Pattern of Misconduct*.  The respondent's misconduct spanned years. The respondent repeatedly engaged in the same misconduct. As a result, the hearing panel concludes that the respondent engaged in a pattern of misconduct.

"22.     *Multiple Offenses*.  The respondent committed multiple rule violations. The respondent violated KRPC 1.7, KRPC 1.8(k), KRPC 1.13(b), KRPC 1.13(d), and

18

KRPC 8.4(c). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"23.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"24.    *Absence of a Prior Disciplinary Record*.  Other than the Missouri discipline imposed for the same underlying misconduct, the respondent has not previously been disciplined.

"25.    *The Present and Past Attitude of the Attorney as Shown by Her Cooperation During the Hearing and Her Full and Free Acknowledgment of the Transgressions.*  During the hearing on the formal complaint, while the respondent generally admitted the facts which gave rise to the violations, the respondent fell short of accepting responsibility for her actions. The hearing panel considers the respondent's admissions to be a mitigating factor. However, the respondent's failure to provide a full and free acknowledgment of the transgressions limits the application of this factor. *See* 31, below.

"26.    *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*.  The respondent is an active and productive member of the bar of the metropolitan Kansas City area. The respondent also enjoys the respect of her peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

"27.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.31    Disbarment is generally appropriate when a lawyer, without the informed consent of client(s):

19

(a)     engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client; or

. . . .

'4.32   Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

'4.61   Disbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potentially serious injury to a client.

'4.62   Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client.

'5.11   Disbarment is generally appropriate when:

. . . .

(b)     a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.'

"28.     The respondent requested that she be allowed to continue to practice and that she be placed on probation, as she was in Missouri. The disciplinary administrator did not object to the respondent's request for probation.

"29.     Kan. Sup. Ct. R. 211(g)(3) states that:

'The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

> (i)      the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

> (ii)     the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

> (iii)    the misconduct can be corrected by probation; and

> (iv)     placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.'

21

"30.     The hearing panel has carefully considered the respondent's request for probation, particularly in light of the fact that the Supreme Court in Missouri accepted the respondent's plan and placed her on probation.

"31.     The hearing panel concludes, however, that in Kansas, probation is not appropriate.

'a.     First, the respondent's plan of probation is not substantial and detailed.

'b.     Further, the respondent's misconduct cannot be corrected by probation. In *In re Stockwell*, 296 Kan. 860, 868 (2013), this court stated that it "is generally reluctant to grant probation where the misconduct involves fraud or dishonesty because supervision, even the most diligent, often cannot effectively guard against dishonest acts." In this case, there is nothing in the respondent's plan of probation that even attempts to guard against dishonest acts.

'c.     Finally, placing the respondent on probation is not in the best interests of the legal profession and the citizens of the State of Kansas. During the hearing on the formal complaint, the respondent was asked how putting her on probation was in the best interests of the citizens in the State of Kansas if she had no plans to practice law in Kansas. The respondent stated that she was not certain how to answer the question. The respondent provided no additional evidence to establish how placing her on probation is in the best interests of the citizens of the State of Kansas. In addition to the respondent's failure to establish how it is in the best interests of the citizens of the State of Kansas for the respondent to be placed on probation, there is evidence to the contrary. The respondent's misconduct is serious. The respondent's misconduct involves significant conflicts of interest as well as dishonest behavior. Further, the respondent failed to take full responsibility for her actions,

22

as the following exchanges at the hearing on the formal complaint establish:

> Q. [By Mr. Eisenbrandt] And would you just tell the Panel what your feelings are about that order and the position that you're in right now?

> A. [By the respondent] I accept the order of the Supreme Court. I understand their interpretation of the facts concluded a violation of the ethical rules.

> . . . .

> Q. [By Ms. Baird] And you understand your stipulation that's been provided to the Panel as an acknowledgement that the information before the Panel demonstrates that you engaged in violation of the Rules of Professional Conduct, the Kansas Rules of Professional Conduct?

> A. I do understand that.

> Q. And you accept the responsibility for that; is that correct?

> A. I accept the fact that that's what it says and responsibility and stipulated to it, yes.

> . . . .

> Q. [By Ms. Butaud] You were asked a couple of times about the order and whether you accepted the order and Kate asked you again and I think what you said, and it kind of bothers me, you said I accept the order and I

23

understand the Court's interpretation of what they thought was a violation. My question to you is, you personally, do you believe there was a violation, not whether you understand that the court interpreted it that way?

A.   I accept--

Q.   I'm asking you if you agree that there was a violation.

A.   I agree that under the rules there is a violation, I do.

Q.   Okay.

. . . .

Q.   [By Ms. Marsh] I guess to follow up on Ms. Butaud's question. That was disconcerting for me as well. And I—in looking at the Panel report from the Missouri findings, they stated that you adamantly refused to acknowledge any wrongful misconduct. Do you now have a different view of the facts or is this—I guess, what's changed?

A.   I don't have a different view of the facts, but subsequent to the pleadings and the hearing and my testimony, I've had an opportunity to look at the facts in the way that the Court is looking at them and I understand how they could have been construed in that manner. And I very much regret what happened and I am contrite about the—any harm that I may have caused any lawyers or any client. I know what happened factually and I do take some issue with some of the allegations that were made

24

against me that were subsequently dropped. And, you know, the—the four years of having gone through this has been very taxing to me personally and so I think with the—pardon me, with the benefit of hindsight is where I've come to understand that—that's why I say I accept their findings because I understand how they could see it in that light.'

Moreover, as detailed above, the ABA standards indicate that disbarment or suspension are appropriate under the circumstances.

"32.    Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent's license to practice law in the State of Kansas be suspended for an indefinite period of time. The hearing panel recommends indefinite suspension primarily because that is the underlying suspension imposed in Missouri. The respondent's success on probation in Missouri is a mitigating factor considered by the hearing panel and an additional reason the hearing panel is not recommending disbarment.

"33.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2015 Kan. Ct. R. Annot. 350). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the

25

truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which she filed an answer, and adequate notice of the hearing before the panel and the hearing before this court. The respondent did not file exceptions to the hearing panel's final hearing reports. As such, the findings of fact are deemed admitted. Supreme Court Rule 212(c) and (d) (2015 Kan. Ct. R. Annot. 369).

The evidence before the hearing panel establishes by clear and convincing evidence the charged misconduct violated KRPC 1.7(a)(2) (conflict of interest); 1.8(k) (sexual relationship with client); 1.13(b) and (d) (organization as client); and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and it supports the panel's conclusions of law. We adopt the panel's conclusions.

The only remaining issue before us is the appropriate discipline for respondent's violations. At the hearing before the panel, the respondent requested that she be placed on probation; the office of the Disciplinary Administrator did not object. The hearing panel recommended suspension for an indefinite period of time.

We agree with the hearing panel that probation is not an appropriate disposition. As the panel concluded, the respondent's misconduct is serious, involving significant conflicts of interest as well as dishonest behavior. Further, the panel found respondent failed to take full responsibility for her actions, and the record supports that finding. We, therefore, conclude it would not be in the best interests of the citizens of the state of Kansas for the respondent to be placed on probation. We agree with the panel's recommendation that the respondent's license to practice law in the state of Kansas be suspended for an indefinite period of time.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Allison L. Bergman be and is hereby disciplined by indefinite suspension from the practice of law in the state of Kansas, in accordance with Supreme Court Rule 203(a)(2) (2015 Kan. Ct. R. Annot. 293), as of the date of this order.

IT IS FURTHER ORDERED that respondent shall comply with Supreme Court Rule 218 (2015 Kan. Ct. R. Annot. 401). In the event respondent seeks reinstatement, she shall comply with Supreme Court Rule 219 (2015 Kan. Ct. R. Annot. 403); a hearing will be required unless she has been released from probation in Missouri.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.